Morning, Your Honors. I have police report opposing counsel. My name is Kevin Elder. I represent the injured worker, Charles Stevens, in this matter. This is a repetitive trauma claim for injuries to a right elbow and right shoulder. He was a union carpenter that specialized in drywall installation. As we all know in this room, repetitive trauma has been a valid theory of recovery and work comp since the Bellwood Nursing Home case decided by our motion or grab or lift caused their injury. They must merely prove that due to a series of repetitive motions that the injured body part was worn down or eroded over time. I don't think anybody would dispute that it's a valid underlying principle, but didn't this case turn really on the Commission's assessments in holding, basically adopting the opinion of Dr. Alteri over Garst? Absolutely, Your Honor. That's... And they had reasons for that, too, why they did that, didn't they? Well, I'm going to try to convince you that their reasons were not good, Your Honor. But yes, that is the crux of this case. And the arbitrator who saw all the witnesses in a lengthy trial, he found and wrote a very nice, thorough, middle-of-the-road decision. He did not give me everything that I was seeking for my claim. He gave me a wage loss claim, but he didn't base it on the wages that my guy was earning at the time. He based it on a middle-of-the-road projection. It was a very well-reasoned arbitration decision by a very well-respected arbitrator. And as you gentlemen, I'm sure, are aware, that the work comp climate has been very different the last three or four years. And our governor is really on a warpath to eliminate repetitive trauma claims. He hasn't been able to do that legislatively. So what he's doing is he's making high appointments. I don't like to get into historical standpoints, but this has been going on for generations. Either you have a workers' compensation commission that thinks every worker is injured, and that's usually under a governor of one party. And then you have a governor of another party who puts commissioners in who have never seen an injured worker. And so the pendulum swings from one side to the other. And so the pendulum happens to be swinging one way, but the commission is still the commission. And they get to make the factual findings, not the arbitrator. Well, the arbitrator also makes the factual decisions. And then, you're right, it's a de novo review for the commission. And so right now, as you've indicated, it's kind of work comp is a bit of a political football and getting special scrutiny. And so I went down two to one on a good decision with a neutral commissioner that was a defense attorney. And I think that's where the case swung. But I want to tell you why I believe that this case is, this decision by the commission, I believe, was against the manifest weight of the evidence. And I am well aware of the burden that I carry in trying to overcome that standard. I have never been the appellant to this court. I have lost numerous cases that involve factual decisions that I have not troubled this court with. But this is one that I really hope and I know that you justices will take a good close look at. And let me get right to the point. And I'll skip the background on the case. You gentlemen are well aware of it. Really, as Justice Hudson pointed out, it comes down to the hypotheticals. And Dr. Garst was provided a hypothetical that I believe was very largely met by the hypothetical that is going to completely comport with the evidence at trial. People are nervous. They forget to add things. They forget what things weigh. And so it is very often, in fact, I'm going to say I've never seen a case where a hypothetical given to a medical provider is exactly matched at arbitration. We have to allow for the gray areas of life. And I believe that my hypothetical does comport here with most of the evidence. There was some difference in weights. But look at how the commission tortured my hypothetical in the math. I can tell you one thing. You do not ever want the commission to build you a structure because your walls will not have any studs in them. So the commission and Justice Hoffman, I figured that you would get on me about this. One piece of evidence that I really should have put in was I should have gotten much better testimony from my guy and the trial. And I freely admit that that is on me. I intended to get that information and somehow got sidetracked at trial. But because of a lack of specific evidence on that, we don't throw out common sense. And that's what the commission did here. Are you saying that the commission felt that your hypothetical was not borne out by the evidence? But you're saying whether he did 200 feet of drywall and did 150 feet, you're saying what's the big deal, right? Well, and I'm saying a little further than that, Your Honor. To say that my hypothetical wasn't accurate because of the math they did. They knocked it down from 200 studs to 38 studs. And that is a big difference. But the truth is that if we built a wall with only a stud at the seam of every 48 inches, they wouldn't be able to run wires through there. The walls would fluctuate. There's no way. So why the commission took apart my hypothetical based on facts that they're not facts. They speculated that the walls would have no studs. And so that is wrong. And when their decision is based on speculation or conjecture, then I would submit that no reasonable trier of fact would have found that these walls were without studs and that my hypothetical fell short. The rest of it, they said that my guy didn't do production drywalling. And that was the other part of the hypothetical about production drywalling. Well, about 25% of his time on the job, he did do drywalling and it was more of troubleshooting and problem areas because my guy was a very experienced drywaller. But that hypothetical, so I'd like you to, okay, so those are maybe where the hypothetical doesn't quite match up with the testimony at trial. But please look. In the very next paragraph, they say how Dr. Atlery, the independent examiner's opinion, is much more persuasive. And please look at the two things that he based it on. He based it on a written job description that was submitted to him first that listed inaccurate weights, underplayed it. The job description he was given, your honors, didn't say anything about framing, about picking hardened fireproofing out of framing. It doesn't say anything about that. What's this videotape you looked at? Where did that come from? Judge, thank you. That's the other element. That videotape, so Dr. Atlery looked at the written description and said, I don't know, maybe there's a causal connection. I need to see more. He requested a job video. Respondent provided him a job video that the only two witnesses at arbitration said, oh my goodness, that has nothing to do with what we did. It wasn't production drywalling. They were putting in an aluminum ceiling. My guys didn't put in an aluminum ceiling. They didn't frame out a door. They didn't have a two-man guy standing in the lift working right. The job video is completely irrelevant. Did you argue that before the prior effect, that the video was misleading? Absolutely, I did. And arbitrator McCarthy agreed with me. He said that the job video was of no relevance. Is the job video in the record? It certainly should be. And if it's not, yeah, please look at the video. The job video goes right out, but after Dr. Atlery sees the job video, then he's like, oh, well, then no, there's no causal connection. Well, sure, because you were watching finish and supervisor drywallers do little light-duty jobs. So we can throw out the job video that Dr. Atlery's opinion is based on and then his job description, the written job description, a piece of drywall they said weighed 78 pounds. Well, absolutely not. There's evidence in the record, both from the internet and from both my witnesses that say that those pieces weighed 128 pounds. So all of their weights, so if Dr. Atlery's opinion was more persuasive, it is based on evidence that was proven to be completely irrelevant to this job. So if the evidence that he bases his opinion on is irrelevant, his opinion has no foundation and you have to throw it out. So then we're left with an opinion based on evidence that was proven completely irrelevant stacked up against my hypothetical to Dr. Garst, which is, I'm going to estimate in the range of 90% accurate. I can't make it completely accurate. And so I think what happened here, your honors, is that the commission understands that repetitive trauma cases are not favored right now by the current administration and I believe, and I'm not calling anybody dishonest. I have great respect for all three of the commissioners in this case, but I believe that they desired an outcome and then they went back and they looked through my evidence and the record. That's exactly what they did so that they could come to the conclusion that they needed to. So I would submit to this court today that their reversal is against the manifest weight of the evidence. It is not based on any evidence that I can see a reasonable trier of fact coming to. So I'm asking you to reverse the commission decision and reinstate the arbitration award and give my client his wage differential. This is a man that is now making $8.50 an hour and he was a union carpenter. He's only 52 years old. This is a life changer for him. We all have our jobs and everything, but this is this gentleman's life. My job as a court is to apply a standard of review to a decision. And so what do you understand to be the standard of review under manifest weight of evidence? That no reasonable trier of fact could have come to that conclusion. And I would submit that no reasonable trier of fact would think that walls don't have studs and do that job that my client and the independent witness described. And once you decide that those bits of evidence aren't relevant to this case, then you have to throw out Dr. Atleury's opinion. And when that's out, the only causal connection opinion is that expressed by Dr. Garst. And that leaves the commission decision based upon conjecture and speculation and bad math. And I think you have to throw it out and I think you need to reinstate the arbitration decision. I appreciate your time today, Your Honors. Thank you, Counsel. Counsel, you may respond. Good morning, Honorable Justices. I'm Robert Newman for the Appellee RG Construction Services. This case is before Your Honors on appeal from the Circuit Court of Peoria County. The Circuit Court affirmed the Workers' Comp Commission decision, which was actually a 3-0 decision by the commission, not 2-1. The standard of review before the Circuit Court and before this Court is whether the commission decision is against the manifest weight of the evidence. It is not. The commission denied a claim for repetitive trauma. The commission noted that the petitioner's claimant's prior counsel propounded a false hypothetical question to Dr. Garst. Now, that's how he elicited a favorable causal connection opinion from Garst, by giving him false data. Now, the hypothetical said that the drywaller had to install 200 studs per day. When the petitioner testified, he said he never installed that. He never installed that and the company reduced the quota to 100 feet of wall space to apply studs to per day. Mr. Newman, you'll agree, won't you, that the commission's math about how many studs has to be wrong. Nobody builds a wall where the studs are 4 feet apart. Well, what they looked at was what's the testimony that Each gave and what's the testimony that the petitioner, Mr. Stevens, gave. Okay, they listened to what he had to say. Each described how you install the stud with a pivot point. The first screw makes the pivot point. Then you line it up and you do the... However, Mr. Newman, you agree that defies common sense. Maybe you don't know anything more about construction than the commission does. But, I mean, we know at least in residential construction, studs are installed 16 inches on center. Well, look, they said 16 inches on a center. If you do that math, then it would be about 116 for 150 feet. And the hypothetical said 200. So the hypothetical instructs the doctor that he did twice as many as he actually did. So it's still wrong. Even if your honor's math is right. Okay, thank you. The commission is still right on the premise that the petitioner's former counsel gave the doctor false information and that's what the doctor relied on. I mean, you make the argument and the commission bought it, but how do you respond to your opponent's argument? You know, that's all well and good. They're picking apart my hypothetical and yet Dr. Ed Lurie reviews a videotape he says, and I don't know if you looked at it. That's completely misleading. It's completely disingenuous. Did you see the videotape? Sure. I looked at it. The videotape reflected a typical work of a drywall installer in an office buildout, which is the typical work for RG Construction Services. The videotape had on it men installing drywall on the framing. It showed installing doors. It showed installing locks on the doors. And it showed installing a ceiling. Now the ceiling was made of aluminum. Most of them are made of acoustical tile. It still showed the general work of a construction carpenter as done with RG. RG is mostly a company that does interior office buildouts. In this case, it was a nursing home that they were doing an interior buildout for. So you're saying it was accurate in terms of what the claimant in this case did on a regular basis? Is that what you're saying? It was accurate in showing the typical work of construction carpenters employed by RG Construction Services. Mr. Stevens said that the work that they did on this particular job was different because the walls were 24 feet high. And that there were tracks installed in the floor and the ceiling. And they were putting the studs between the tracks. That's another point. That the tracks that were already installed in the floor and ceiling would give structural support to the walls. So it's untypical in that way too, Your Honor. So yes, it's a different type of construction that they did in this particular office. Does that bear on the result, Your Honor? No, I don't think that really bears much on the result because of the fact that Dr. Antleri was looking for a specific thing. He was looking for whether there's heavy overhead work and the petitioner claimant, Mr. Stevens, did not when he scraped the fireproofing out of the top track. But he was only working on the top track half of the time. He was working on the bottom track the other half of the time. When he's working on the bottom track, he's scraping below shoulder level. It would be less than 30 percent. He said he was on top of the top about 30 percent of the time. So it's not frequent. And even when he's working on the man lift on the top, they have to measure how far from the last stud to the current stud. They have to measure from the top to the bottom. The guy on the bottom has to cut the piece while the guy on the bottom is cutting the piece. The guy on the front is preparing to install it at the top. Then they have to screw it in. Then they have to move the man lift. So the task of scraping out this fireproofing material is only a small fraction of the job, not a big fraction of the job. The other point I want to get to, Your Honor, is that Dr. Atluri's opinions are not based solely on the job description video. A lot of it is based on the actual physical findings in this case. Dr. Atluri concluded that this individual had degenerative conditions in his elbow and shoulder. Dr. Atluri concluded that this was a systemic problem because of the fact it involved more than one joint. And in these two joints that were involved, it involved more than one compartment. All three compartments in the elbow and two compartments in the shoulder had this degenerative arthritis. Now, what if the evidence established an aggravation of that preexisting condition? Wouldn't it be compensable? Well, if so, but it didn't, that's what Dr. Atluri testified to. He explained that, you know, maybe the person had some discomfort while he was working, but it's similar to a situation where someone might fall on the way to work and break a finger. When they get to work, if they're typing, they may have some discomfort. But the typing didn't cause the injury. It was the fall. That's when the person had the fracture. And with respect to the elbow, Dr. Garst admitted that this man had an aseptic necrosis condition in the elbow, which is a condition because of circulation. There's not enough circulation to adequately support the life processes of the bone, so he had bone flaking off. That's where the loose bodies came from that Dr. Garst removed in his surgery. So it's not a typical repetitive trauma type injury. It's a totally different type of injury. It's a consequence of the aseptic necrosis, and Dr. Garst admitted that in the cross-examination in the shoulder. There were some unusual findings there, too. There are crystalline deposits. Dr. Garst admitted that this was either a gout or rheumatoid type of arthritis in the shoulder, but he didn't follow it up with any further testing. So there was a lot of compelling evidence that there's something going on here in this man that is a systemic condition that is not a work-related condition of ill-being. In addition, before Mr. Stevens started working with RG in April of 2012, he was under treatment with Dr. Moussatieff. He'd been there on March 3rd and January 2nd of the same year. He was on Vicodin for elbow and other general body aches. So he had the problem before the time of work that he's trying to blame it on. So those are a series of facts that have nothing to do with the video that Your Honor asked me about that support and why the commission relied on Atluri and not Garst. The commission found that the claimant's prior counsel misled Dr. Garst. They gave him false information. He based his opinion on false information. Dr. Garst said his opinion was based only on a general feeling. He did not have any medical literature to rely on. He did not rely on a textbook. He did not rely on a published study of any kind. It was just a general feeling. The commission was within their rights to say that Dr. Garst's opinions are not credible on the causal connection and accident issue. The commission then decided that Dr. Atluri's opinions were more worthy of belief and, as Your Honor said, many times decided that when the commission makes a choice between two doctors who are well-qualified and who have opinions on the matter, once the commission's made that call, it's a call that this Honorable Court will not reverse on judicial review. And the credibility, yes. Dr. Garst's opinion was deemed by the commission not to be credible because they felt it was induced by a false hypothetical propounded by the previous counsel for the claimant. So they're within their rights as the trier of fact to decide that this doctor's opinion is not credible. And they so decided. So when Dr. Garst's opinion is eliminated from the case as not credible, then there's nothing to support the petitioner's claim and it's properly denied. And so with that, oh yes, a few other things. The arbitrator's decision was found not to be credible by the commission. The claimant, when he testified, said he never did production drywall in that job. He just did patches and repairs. So that was one of the reasons why the commission discounted and reversed the arbitrator. In the job description we provided, it said a 4-by-8 sheet of drywall weighs 73, which is correct. The claimant testified 4-by-12 weighs about 120. That's correct, too. It's just a difference in the size. Nobody was trying to fool anybody on that. Again, Pat Lurie stressed the medical findings, three components in the elbow, two components in the shoulder that would not be causally related to an occupational injury. It would be a systemic arthritis. And that's why he found that there was no causal connection between the two. There was no causal connection. That's why the commission relied on him. And I pray we'll affirm the circuit court and deny the case. Thank you. Thank you, counsel. Counsel, you may reply. I just want to touch on the medical. There is no doubt that Petitioner Stevens had a pre-existing right elbow condition. I didn't try to hide that in the brief. He was unable to straighten out his right arm. Bob paid somebody two weeks over a year period to follow my guy around. They never caught him straightening his arm or doing anything that he said that he couldn't do. The medical, he had a ruptured bicep tendon and a partially torn rotator cuff. Those aren't caused by arthritis. A ruptured bicep tendon, that's an injury that you usually know when it happens. And my guy had absolutely, there's no evidence of any prior right shoulder problems whatsoever before he spent a little over four months working. He said most of his job, 50 to 80% of it was overhead. 25% of the time he did handle drywall. And I can't imagine that handing up a sheet of 128-pound drywall over your head while another guy grabs it and gets it in place, if that's not strenuous overheading, that's not a good thing. If he hadn't said work according to Dr. Atlery, then I don't know why we would believe a word that Dr. Atlery says. Because, Justice Hudson, you hit on it. That's absolutely aggravation of a pre-existing condition. And that is what Dr. Garst also testified to. So again, I just ask that you reverse the commission. Thank you for your time. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement. A written disposition will issue.